# CHARLESTON.

## MANN *v.* PECK *et al.*

### Submitted January 25, 1898—Decided April 16, 1898.

1. RES ADJUDICATA—*Commissioner's Report—Liens.*

    Where liens on land have been ascertained by commissioner's report and decree, and the land sold by special commissioner for more than sufficient sum to pay all such liens, sale confirmed, purchase money all paid, and a decree entered declaring that all such liens were "fully satisfied and discharged," such decree is *res adjudicata* as to holders of such liens who were parties to the suit. (p. 25.)

2. ESTOPPEL—*Recognition of Transaction —Laches.*

    When a party, with full knowledge, or at least with sufficient notice or means of knowledge, of his rights, and of all material circumstances of the case, freely and advisedly does anything which amounts to the recognition of a transaction, or acts in a manner inconsistent with its repudiat'on, or freely and advisedly abstains for a considerable lapse of time from impeaching it, there is acquiescence, and the transaction, although originally impeachable, becomes unimpeachable in equity. (p. 26.)

Appeal from Circuit Court, Monroe County.

Action by Frank N. Mann against C. L. Peck and others. Judgment for plaintiff, and defendant Jesse Jones appeals.

*Affirmed.*

J. J. SWOPE, for appellant.

MILLER & READ, for appellee.

McWHORTER, JUDGE:

F. N. Mann filed his bill in chancery in the Monroe cir-

cuit court to enforce a mechanic's lien against the house and lot of C. L. Peck; and on the 8th day of October, 1895, the cause came on to be heard, and it "appearing to the court that there is due to the defendant Jesse Jones the sum of $190.95, which is a first lien upon the house and lot mentioned, with its interest from October 5, 1885, and that there is due the defendant A. J. Jones, as of same date, the sum of $302.84, and a bond executed by the defendant Peck to A. J. Jones for $200, due December 1, 1885, both of which sums are for balance of purchase money due upon the house and lot in the bill mentioned, and to the plaintiff there is due the sum of $65.47, to be paid next after the purchase money due upon said house and lot is paid, and to the defendant W. R. Johnson the sum of $56.58, to the defendants H. Coen & Son the sum of $84.40, and to the defendants G. W. Graves and Clark Howell the sum of $58.87, which four last-mentioned liens bear interest from the 5th of October, 1895, until paid, and are to be paid in the order named in this decree;" the decree further ordered the payment of several sums, and, upon failure thereof, John Osborne, a special commissioner appointed for the purpose, was to make sale of the property, under which decree the said Osborne sold the same to Frank N. Mann, at the sum of nine hundred and fifty dollars, of which sum he paid eighty-five dollars and thirty cents in cash, and for the residue executed his three bonds for two hundred and eighty-eight dollars and twenty-three cents each, due in six, twelve and eighteen months after date, with interest from the day of sale, with James Mann as security. The said property had been sold by Jesse Jones to his son, A. J. Jones, and the one hundred and ninety dollars and ninety-five cents provided for in the decree to Jesse was the balance due from A. J. on purchase money. By contract dated the ——— day of April, 1884, A. J. Jones had sold the property to C. L. Peck, in consideration of the Alderson Statesman, a newspaper, and certain fixtures, and Peck gave his three notes, each for two hundred dollars, without interest, payable, one December 1, 1884, another June 1, 1885, and the other December 1, 1885, and a note of Luther Graham for seventy-five dollars. After the sale, under the decree to F. N.

Mann, he (Mann) purchased all of these liens provided for in the decree, and purchased and took an assignment of three two hundred dollar notes given by Peck to A. J. Jones, and the Luther Graham seventy-five dollar note, and settled with and paid to Commissioner Osborne the whole purchase money.   On the 17th of March, the following decree was entered:   "This cause came on to be further heard on the papers formerly read and the report of Commissioner Osborne of the sale made by him under the last decree entered in this cause, to which there are no exceptions, and the same is hereby confirmed.   And it appearing to the court that the plaintiff, F. N. Mann, and C. L. Peck have agreed that the property sold and above referred to shall be accepted by the said Mann and the other creditors in full satisfaction of all the liens docketed against the defendant C. L. Peck, and reported by Commissioner Kester, it is adjudged, ordered and decreed that the said John Osborne proceed to collect the bonds of purchaser, and distribute the same among the creditors as agreed upon between them, and that the liens against the said C. L. Peck docketed and embraced in the said report of Commissioner Kester shall be, and are hereby, declared fully satisfied and discharged.   And the said Commissioner Osborne is authorized to withdraw the bonds of the purchaser filed in this cause, leaving copies thereof in the papers; and, when all the purchase money is paid, the said commissioner is ordered to execute a deed for the said property to the purchaser, F. N. Mann, and to report his proceedings to this court for a final decree.   And the said John Osborne, out of the proceeds of the said sale, is directed to pay all the costs of this suit heretofore and hereafter accrued and accruing in the circuit court, and that the purchaser pay to him a fee of five dollars for the deed hereinbefore ordered to be made.   W. G. Hudgin, Attorney for C. L. Peck and Ella H. Peck.   Houston & Co., Attorneys for F. N. Mann and H. Cowen & Sons.   A. N. Campbell, Attorney for A. J. Jones.   J. D. Logan, Attorney for W. R. Johnson.   John Osborne, Attorney for G. W. Graves."   On the next day, an order was entered in the cause giving leave to the purchaser, Mann, to sue out of the clerk's office a writ of posession, to put him in

possession of said house and lot.    On the 6th day of October, 1887, on motion of the plaintiff, the cause was omitted from the docket.

On the 7th day of June, 1894, on motion of the said Special Commissioner Osborne, the cause was reinstated on the docket as having been prematurely omitted, and a rule awarded against Frank N. Mann, the purchaser, to show cause why the property should not be resold to pay the sum of three hundred dollars, balance due and unpaid on the purchase money for said house and lot.    On the 10th day of October, 1894, said Frank N. Mann answered said rule, stating that, when he first determined to buy the property, he bought the claims of A. J. Jones, which included that of Jesse Jones, at a discount of eight per cent. from their face value, and turned them over to Special Commissioner Osborne, which included the three notes of Peck, indorsed to him by A. J. Jones; that the transfer was made with the full knowledge of Jesse Jones, and that Jesse Jones had since said that, if A. J. Jones had gotten the money that respondent had promised him for said debt, it was all right, but that, respondent not having paid the money to A. J. Jones, he wanted the respondent to pay it to him, and filed with his answer said three notes and three checks which he had given to A. J. Jones in payment of the notes, and, having fully paid all the purchase money, said Special Commissioner Osborne had made the deed to respondent; and claiming that an acquiescence in this transfer for at least —— years upon the part of Jesse Jones estopped him from setting up any claim as against respondent; and asking that the said A. J. Jones and Jesse Jones be brought before the court, and the matter inquired into, and determined whether or not Jesse Jones permitted his son A. J. Jones to make this transfer, and, if made without his knowledge, if he afterwards assented to it. And on the 6th of June, 1895, A. J. Jones and Jesse Jones filed their respective answers.    Jesse Jones, in his answer, says he was a party to the suit, and that the sum of one hundred and ninety dollars and forty-five cents, with interest from October 5, 1895, was reported in his favor as the first lien by Commissioner Kester in said cause; that Special Commissioner Osborne made the sale of the prop-

erty, and collected the money, but never paid respondent one cent of his recovery in the cause; that he had insisted on payment, but had not been able to collect it; denied that A. J. Jones was ever his agent to collect this money, or that he ever gave A. J. Jones, John Osborne, or F. N. Mann any authority to settle or adjust his claim in any manner. Respondent says that A. J. Jones was a large lienor in the suit, and that he was informed that he did sell or make some agreement with Mann about his claim, but none as to respondent's claim, and denied that he had been guilty of laches in this matter, but, on the other hand, he had for years urged the payment of his money, and he was unable to collect it; that he was going to proceed against Special Commissioner Osborne and his bondsmen for the same, and, to avoid this suit against him, the said Special Commissioner Osborne had the rule against the purchaser, F. N. Mann; and prayed for a resale of the property to pay his debt. A. J. Jones answered, and stated that he did sell his interest in the suit to Mann after the purchase of the property by Mann, but denied that he was agent for Jesse Jones, or that he sold or in any manner disposed of Jesse Jones' claims in it; that he had nothing to do with Jesse Jones' claims; that he never had any authority to attend to Jesse Jones' interests in the cause; and that he never told or intimated to Mann that he represented Jesse, Jones in any manner whatever; and that he did not consider that he had any further interest in the suit after he sold his recovery to Mann.

Depositions of various witnesses were taken on the question of the agency of A. J. Jones for his father, Jesse Jones. On the 21st of September, 1895, the deposition of J. L. Rowan was taken, who says: "Some three or four years ago, Mr. Jesse Jones came to me, and my recollection is that he claimed a debt due him from Frank Mann, and that the money was in the hands of Mr. Osborne; and after we talked about it, I went with Mr. Jones to see Mr. Osborne, and get a statement from him as to the status of the case. Mr. Osborne stated that he had paid the money to Mr. Jones' son, and Mr. Jones denied that his son had ever collected it,—that is my recollection,—but said, if he had, of course he did not desire the money to be paid

again, or words to that effect; and I considered the matter
dropped then and there, as he said no more to me as coun-
sel." John Osborne testifies that, before the sale, Mann
came to him, and told him he had purchased the notes
from A. J. Jones, and wanted to know if he would take in
Jones' debt as so much money if he bought the property,
and he told him he would, and it would only be necessary
to exchange receipts in that case to satisfy the Jones debt.
He did turn over the notes,—three notes, of two hundred
dollars each,—and a receipt from A. J. Jones to James
Mann, for fifty dollars, which witness filed as a part of his
answer, marked "Y," which is a transfer of the seventy-
five dollar note; and he paid him the balance of the pur-
chase money in cash, and he made him a deed as special
commissioner for the property; that he heard nothing
more of the matter for nearly five years, when, in a suit
before Justice I. E. Bare, the matter was brought to his
attention by A. J. Jones claiming, in the presence of his
father, Jesse Jones, that F. N. Mann had not paid all that
he agreed to pay for his debt against Peck; and the cash-
ier of the Greenbrier Valley Bank was examined as a
witness, to show that A. J. Jones had been paid through
the bank by James Mann's check the sum of four hundred
and seventy-nine dollars and ninety-five cents, by Frank
Mann's check ninety-seven dollars and eighty-four cents,
and the receipt above referred to, also filed, which, with a
discount of eight per cent. on the said notes, showed that
they had been fully paid; that on that occasion Jesse Jones,
although fully aware that F. N. Mann claimed to have
bought the entire debt of himself and A. J. Jones, and
paid therefor in full, did not dispute the right of A. J.
Jones to sell the same, nor make any claim upon him (de-
ponent) upon that occasion for the debt he is now claim-
ing, nor dispute the deponent's right to have paid the
same to F. N. Mann, as he had done, and as he knew on
that day he had done. Witness further said: "About two
years after this, Jesse Jones came to me, and wanted me
to pay him this one hundred and seventy-five dollars and
its interest, which was reported as a debt of one hundred
and ninety dollars and forty-five cents, which was claimed
as debt No 1 in said suit. I told him that his son A. J.

Jones had sold this debt to F. N. Mann. He said, "This is the first I ever heard of it." I told him that that would not do, and told him the whole matter had been gone over in his presence in the manner stated above at the trial before Justice Bare, and told him he ought to have objected then. I told him also that, if A. J. Jones had no authority to sell this debt, he had put himself in a very close place. He said that was all right if Frank Mann had paid his son Andy what he promised, but, as Andy hadn't got it, he wanted it. I told him that it had been shown on that trial that Andy had been fully paid. Either on that day or not long thereafter I showed him these notes indorsed by A. J. Jones, and which were filed as Exhibits 1, 2, and 3 to the answer of F. N. Mann to the rule issued against him in this cause. A good while after this, but I can't say how long, Jesse Jones and John L. Rowan came to my office to see me in relation to this matter. I went over the matter fully with both of them, and said to Mr. Jones: 'If Andy has already collected this money, you do not want to make Frank Mann or myself pay it over again, do you?' He said: 'If Andy has gotten the money, it is all right. I don't want to collect it again, but Andy says he hasn't got the money.' I heard nothing more of this matter for about a year, when Mr. J. J. Swope took it in charge and these proceedings were instituted. No money was paid me by Mr. Mann. We simply exchanged paper, I giving up his bonds to me as special commissioner, and taking the three notes above mentioned as evidence of payment of the debt." F. N. Mann, examined as a witness, states that he bought the debts from A. J. Jones, and paid him the full amount, and states how he paid for them, and that on the trial before Justice Bare, mentioned by witness Osborne, the matter of his contract with Jones and the payments to him were fully gone over in the presence of Jesse Jones, and that Jesse made no objections to Andy selling to him his debt, and did not set up any claim to it at that time. The depositions of Jesse Jones and A. J. Jones were also taken, and were, in substance, about the same as their answers, denying the agency of A. J. Jones and his right to sell the claim of Jesse Jones. On the 7th day of October, 1895, the cause was heard upon the rule against

said Mann and Jesse Jones and A. J. Jones, and upon the answers and depositions; and the court held that Frank N. Mann had fully paid all the purchase money for the real estate bought by him, and that he was the owner by purchase from A. J. Jones of the debts decreed to A. J. Jones and Jesse Jones in the suit set out in the commissioner's report, and that the sale of said debts by A. J. Jones to F. N. Mann, even if not known to Jesse Jones at the time, was subsequently confirmed and ratified by said Jones; and the court discharged the rule as to Mann, and gave him costs against Jesse and A. J. Jones, from which decree Jesse Jones appeals, and assigns as error that the court did not allow appellant to recover his money in said proceedings, and did not have said recovery of his debt paid by F. N. Mann, or the property sold to pay the same.

It will be seen that the claim of Jesse Jones was reported by the commissioner and allowed in the decree of October 8, 1885, as the first lien upon the property; that the property was sold upon the 31st day of December, 1885, and that eighty-five dollars and thirty cents cash was paid thereon on the day of sale, the balance to be paid in six, twelve and eighteen months; that on the 17th of March, 1886, the sale was confirmed. The costs of suit were paid out of the cash payment, thirty-five dollars and thirty cents, leaving fifty dollars to apply to the first lien, at the time of the confirmation of the sale, and the first deferred payment after the application of the fifty dollars to the first lien would have been largely more than sufficient to pay off said first lien, so that it should have been fully paid off in June, 1886. In the decree confirming the sale, on the 17th of March, 1886, the court ascertains and decrees that all the liens reported by said commissioner, and provided for in said decree of sale, were fully satisfied and discharged. This is a complete adjudication of all the principles involved in the suit between the parties,—a satisfaction and discharge of all the liens. Although Jesse Jones was a party to the suit, and owner of the first lien upon the property sold, there is nothing on the record to show that any legal steps were taken to collect his claim until the 7th day of June, 1894, more than eight years after the rendering of said decree declaring the satisfaction and

discharge of the liens.   This being a final decree, and ap-
pealable, it is *res adjudicata* as to his claim, no appeal hav-
ing been taken or bill of review filed in the cause.   While
Jesse Jones denies that he authorized his son A. J. Jones
to dispose of his claim for him, he does not absolutely re-
pudiate his action therein, nor does he deny in his answer
to the rule the allegation in the answer of F. N. Mann that
the claim of Jesse Jones was represented in the notes of
C. L. Peck assigned to him by A. J. Jones; neither does A.
J. Jones deny the said allegation in his answer to the rule,
and a decided preponderance of the testimony is that the
whole matter of the sale of the claim of Jesse Jones by A.
J. Jones came up at the trial before the justice in the suit
of A. J. Jones against F. N. Mann, and was brought to his
knowledge at that time, and that he made no objection to
the action of his son in selling it, nor did he set up any
claim to it at that time; nor does he deny that the whole
matter came to his knowledge at the time of the trial be-
fore the justice.   And the testimony of John L. Rowan
shows that it was brought to his attention about 1891 or
1892, some four or five years after the decree was ren-
dered, which is also testified to by Mr. Osborn.

I think the insistence of the apellee that the said Jesse
Jones, by waiting and sleeping on his rights, was guilty of
gross laches, is sustained.   There is nothing in the record
to show that Jesse Jones was in a pecuniary condition to
conveniently do without the money which was decreed to
him, when the property was sold and the money collected,
which should have been paid to him for the asking, and to
remain without such dues year after year for six or eight
years.   The circumstances of the case very strongly cor-
roborate the preponderance of testimony taken in the
matter, that he knew that his son had sold this claim, and
that he had authority from him to do so, or at least that he
acquiesced in the action of his son.   "When a man, with
full knowledge, or at least with sufficient notice or means
of knowledge, of his rights, and of all material circum-
stances of the case, freely and advisedly does anything
which amounts to the recognition of a transaction, or acts
in a manner inconsistent with its repudiation, or lies by
for a considerable time,   *   *   *   or freely and advisedly

abstains for a considerable lapse of time from impeaching it, there is acquiescence, and the transaction although originally impeachable, becomes unimpeachable in equity." Herm. Estop. p. 1194. "If a party is guilty of laches or unreasonable delay in the enforcement of his rights, he thereby forfeits his claim to equitable relief." *Id.* p. 1360; *Trader* v. *Jarvis*, 23 W. Va., 100. I see no error in the decree and the same is affirmed.

*Affirmed.*